## BRIGHT *v.* McOUAT.

LANDLORD AND TENANT.—*Statute.*—*Common Law.*—The second section of the act in relation to landlords, tenants, lessors, and lessees, 2 G. & H. 359, changes the rule that existed at common law, that a tenancy at will could arise or be created by implication.

SAME.—*Holding Over.*—*Implied Tenancy.*—Ordinarily, the tenant's holding over and the acceptance of rent by the landlord create by implication a new tenancy, of the same character, annual, quarterly, monthly, and upon the same conditions, as the previous tenancy. Any agreement as to the new tenancy controls and makes it, not an implied tenancy, but one of contract so far as the agreement affects it.

SAME.—*Future Term.*—*Holding Over.*—Where a tenancy is by agreement for six months, and by this agreement, at the expiration of this term, the right is reserved in the tenant, to hold for a longer term, the landlord is entitled to possession at the end of the term, unless the tenant exercise his privilege to hold for a period to be fixed by him ; if he hold over and at the end of a month pays the rent for that time, and the landlord receives the rent, the tenant not having fixed the term of the new tenancy, it becomes one for six months, subject to the same covenants and conditions as the previous tenancy. Upon the holding over for another month at the expiration of the second tenancy, another term of six months is entered upon, there being no express contract as to time. But any agreement then made as to the terms of the tenancy will control any implication that might otherwise arise.

APPEAL from the Marion Common Pleas.

BUSKIRK, J.—This cause came into the common pleas court on the 8th day of January, 1870, by appeal from the judgment of a justice of the peace, against the claim of McOuat, who was plaintiff below.

The complaint states that on the 19th of September, 1868, McOuat executed to Bright a lease of certain rooms in a building in Indianapolis, known as the "Capital House," for the term of six months, at the rate of eighteen hundred dollars per annum, payable in monthly instalments of one hundred and fifty dollars at the expiration of each month ; that the lease contained a provision, to the effect that Bright might have the refusal of the premises for a longer term ; that he did choose to continue the lease for a longer term, to wit, for one year from March 19th, 1869 (a copy of the lease was exhibited) ; that the defendant, Bright, was indebted to the plaintiff, McOuat, for one month's rent falling

due on the 19th day of November, 1869, which he refused to pay, and for which plaintiff sued.

The lease exhibited with the complaint is substantially as described in the complaint. The *habendum* clause is as follows: "To lease and to hold the said described premises to the said party of the second part, for and during the term of six months from the 19th day of September, 1868."

After various covenants relating to the payment of rent, the manner of cleaning out stove pipes and chimneys, and carrying out ashes, providing that the premises should be used only as a printing office and bindery, and that no part of the premises should be sub-let, nor the lease assigned without written consent, the lease concludes with this provision: "And it is further agreed between the parties, that the party of the second part will have the refusal of said above-described premises, at the expiration of this lease, for a longer term."

The cause was tried in the common pleas by the court. The finding was in favor of the plaintiff. A motion by defendant for a new trial, for the general reasons that the finding was unsustained by sufficient evidence, and was contrary to law, was overruled, and final judgment for one hundred and fifty dollars went on the finding. An exception was reserved to the overruling of the motion for a new trial.

The only error assigned is based upon the refusal of the court to grant a new trial. This assignment of error presents for our decision two questions, one of law, the other of fact.

It is maintained by counsel for appellee that as the appellant had the option for a longer term, he could, at the expiration of the lease, have made it one month, six months, or longer, and that if he had determined the period and informed the appellee of such determination, this would have fixed the length of the extended term as provided in the lease; that the appellant having failed to fix the length of the extended term, and having held over without fixing the extended term, he became a tenant either for six months,

subject to all the terms and conditions of the written lease, or a tenant from year to year, subject to said terms and conditions.

The appellant, on the other hand, denies the correctness of the position assumed by appellee, and insists that "a party, holding over under the facts of this case would be a tenant either at will or by sufferance; that a mere continuance in possession is not enough to create a tenancy from year to year; that the landlord must accept rent; for until the payment and acceptance of rent, the party would be strictly a tenant at will; that the tenancy arising out of a mere holding over is not such a general tenancy as is contemplated by our statute defining tenancies from year to year."

At common law, there were three estates less than a freehold: first, estates for years; second, estates at will; third, estates by sufferance.

An estate for years is defined to be "every estate which must expire at a period certain and prefixed, by whatever words created." 2 Shars. Blackstone, 143.

Washburn on Real Estate defines such estate as follows: "Estates for years embrace such as are for a single year, or for a period still less if definite and ascertained, as a term for a fixed number of weeks or months, as well as for any definite number of years, however great." 1 Washb. 291; 1 Chitty Blackstone, 112; Taylor Landlord and Tenant.

An estate at will is defined as follows: "An estate at will in lands is that which a tenant has, by an entry made thereon under a demise to hold during the joint wills of the parties to the same. It does not arise till actual possession taken by the lessee, and is determinable at the will of either party to the demise." 1 Washb. 370.

At common law this was originally the nature of all estates created by demise for an uncertain period of time. From an early period, in order to obviate the inconveniences growing out of so precarious a tenure, estates, which at first were held to be at will, grew, by usage, into terms which were not subject to be defeated at the mere will of either party,

and took the name of tenancies from year to year. "This change of tenancies at will into estates from year to year was the result of judicial legislation, as a measure of equity as well as sound policy, though as has already been seen, numerous cases were still left of tenancies strictly at will." 1 Washb. 382.

At common law, an estate at will could be created either by an express or implied contract. An important modification of the common law in reference to tenancies has been made by our statute in relation to landlords, tenants, lessors, and lessees. It is provided by the second section of said act, that "a tenancy at will cannot arise or be created without an express contract; and all general tenancies, in which the premises are occupied by the consent, either express or constructive, of the landlord, shall be deemed tenancies from year to year." 2 G. & H. 359.

By the above section a tenancy at will cannot arise or be created without an express contract, and this changes the rule as it existed at common law, that such an estate could arise or be created by implication. The remainder of the above section changed many estates at will into estates from year to year. This court, in *Brown's Adm'rs* v. *Bragg*, 22 Ind. 122, placed a construction upon the phrase "all general tenancies," and held that the legislature meant by such words, "such tenancies only as were not fixed and made certain in point of duration, by the agreement of the parties." Such estate is, in substance, the same as that created by the courts as explained by Washburn, *supra*, who, in a subsequent section shows how such an estate can be created, its character, and how terminated. He says: "It will be sufficient, to establish a tenancy from year to year, to show an entry under a general letting, or a letting for an indefinite time, and either an agreement to pay rent measured by the year or its aliquot parts, or an actual payment of rent if none was originally fixed and agreed upon; and such tenancy once established, will continue until determined by notice to quit, or some other sufficient legal cause." 1 Washb. 382.

The most material difference between an estate for years

and one from year to year is, that the former is for a fixed and determinate period, while the latter is for an uncertain and indefinite term.

An estate by sufferance is defined by Washburn as follows: "When a tenant has come rightfully into possession of lands, by permission of the owner, and continues to occupy the same after the time for which, by such permission he has the right to hold the same, he is said to be a tenant by sufferance. In the language of the elementary writers, 'he is one who comes in by right and holds over without right.' He holds without right, and yet is not a trespasser."

Again, he says: "And yet a holding by sufferance is rather like a tenancy between landlord and tenant than in fact such a tenancy, for it is defective in one of the elements of such a tenancy, namely, an agreement express or implied, by which it is continued. The moment the parties agree, the one to hold and the other to permit him to hold possession, it becomes a tenancy at will, or from year to year, and ceases to be one at sufferance, and such would be the effect of paying and receiving rent for the time the tenant should hold over. There is neither privity of contract nor of estate between the owner and tenant, for the tenant is not in by contract, nor has he any estate which he can transfer or transmit, or which can be enlarged by release. He has a mere naked possession, without right of notice to quit. But though this possession is wrongful, he is, for technical reasons, not liable in trespass by reason thereof. His holding is by the laches of the owner, who may enter at any moment and put an end to the same. But until that has been done, he cannot have trespass against the tenant for such occupation. And where he has made such entry, he may treat the tenant as a trespasser in holding over, or any one holding under him. But neither tenant at will nor tenant at sufferance can maintain trespass against lessor for making a peaceable entry upon the premises."

Having thus ascertained the different kinds of tenancies

existing in this State, we proceed to inquire what class the tenancy in the present case comes under.

We find the law upon the point under consideration stated with so much accuracy and fulness by the Supreme Court of California, that we have made an extended quotation. That court, in *Blumenberg* v. *Myres*, 32 Cal. 93, say: "The doctrine which the plaintiff invokes, that where the lessee holds over and the lessor receives rent accruing after the expiration of the term, a new tenancy arises for a further term, subject to the covenants and conditions of the original lease, is true as a general rule, and the reason is, that the receipt of the rent is considered as an acknowledgment of a subsisting tenancy. But it does not follow that the new term must necessarily be a year. Where the former lease was for a period less than a year, as a quarter or a month, or where the term, though extending to a year or more, was composed of such periods, there is no ground for holding that the new term, presumed from the holding over of the tenant, and the receipt of rent by the landlord, extends beyond one of the periods of the tenancy. The tenant who enters under a lease for a month, and holds over, and during the second month pays rent, is not entitled to claim a new term of one year, but he becomes a tenant from month to month. When the tenancy is found from the fact of the holding over of the tenant and the acknowledgment of the landlord, it is presumed to be of the same character—as annual, quarterly, monthly, etc.—and upon the same covenants and conditions as the previous tenancy. It rests upon implication alone. But when the parties have made an express agreement relating in any respect to the new tenancy, then, in that respect, there is no room for implication. If the parties specify the rent, the time of payment, the term, or any of the usual covenants or conditions of a lease, whether they agree or disagree with the terms of the former lease, they enter into the new lease and determine the rights of the parties, while the tenant is holding over." We refer to the following authorities as sustaining

Bright *v.* McOuat.

the doctrine laid down in the above case: *Jackson* v. *Salmon*, 4 Wend. 327; *Webber* v. *Shearman*, 3 Hill N. Y. 547; *Bennock* v. *Whipple*, 3 Fairf. 346; *Finney* v. *City of St. Louis*, 39 Mo. 177; *Bradley* v. *Covel*, 4 Cow. 349; *Conway* v. *Starkweather*, 1 Denio, 113; *Bishop* v. *Howard*, 2 B. & C. 100.

In the case in judgment the lease was for the definite period of six months, and therefore was a tenancy for years. At the expiration of the term as fixed by the original lease, the tenancy terminated, and the appellee was entitled to the possession of the premises without any notice to quit, unless the appellant exercised the privilege conferred by the lease to hold for a further period. The appellant had the right, under the lease, to determine for what further period he would occupy the premises, but this he did not do. He continued to occupy the premises without any express agreement as to the length of such occupancy. At the end of the first month he paid the rent, which was received by the landlord. The holding over by the tenant and the receipt of rent by the landlord created a new term of six months, subject to the same covenants and conditions as the previous tenancy. This new term commenced on the 19th day of March, 1869, and ended on the 19th day of September of the same year, and as the appellant continued to hold over after the expiration of the second term for six months, and the appellee to receive rent, it results from the principles hereinbefore stated that another term for six months was in like manner created, and that the appellant was liable for a month's rent on the 19th of November, 1869, unless the parties, at the expiration of the second term, by mutual agreement or understanding, fixed and rendered definite the terms as to the duration of the further occupancy of the premises. The creation of the new term, as we have seen, in the absence of a contract, rests solely upon implication, but such implication does not arise where the parties have by contract, express or implied, determined and prescribed the terms upon which the premises are to be occupied. We cannot indulge a presumption in the face of an agreement

by the parties. In such a case, we apply the law to the facts as they are found to exist.

We are next to inquire whether the parties have, by mutual agreement, fixed their respective rights and liabilities. The solution of this question depends upon the construction of the evidence, and as the evidence is brief, we will set it out. It was as follows:

Said plaintiff being sworn, testified as follows: "We had several conversations about the time of the expiration of the lease; I told him I did not care when he went out, if it was such a time as I could make improvements; he said if he did not go out at such a time, he would pay rent until he could; can't say that this is his language, but it is in substance; can't give the exact date; it was after the six months had expired a short time; it was satisfactory to me; we were walking through the press room; last conversation was in front of English's bank, where he said he would go out in a few days; it was shortly before he left the building; I then called his attention to the fact of prior conversations, that if he did not go when I could make certain improvements, and in time for this, he would pay rent; he did not deny it, but called my attention to the fact that he was going to make certain improvements, and I could do so as well as he; he went out on the 19th day of October, 1869; Bright occupied the premises from the 19th day of March, 1868, to the 19th day of October, 1869."

Being cross examined, the plaintiff said: "Bright purchased the Wesley Chapel while occupying the leased premises, but can't state the time; it was, perhaps, in the summer; I was at the sale, and it was understood that as soon as he could get in he would remove to his own establishment; in September he paid me one month's rent (on the 19th), and said it would be but one more month; I replied to this that I hoped I would get as good a paying tenant; and on the 19th of October he paid me another month, in full of rent to that day; the time of payment, on the 19th of September, was the first intimation I had of the time when

he would leave; I suggested to him he might go out at a time when I could not make improvements; he said he would pay rent; the six months of the original lease expired March 19th, 1869; I applied about that time for a new lease, urging him to make one, and he had been putting me off; my object was to know when he was going out, so as to calculate on making improvements; think the conversation was before the purchase of the Wesley Chapel property; do not think I talked with him after the purchase of the chapel property; do not think he said if he went out at a time when repairs could not be made he would pay the damages likely to be sustained; witness boards at his brother, Andrew McOuat's, corner New York and East streets; if I had any place of business it was there; on the 19th day of October, 1869, was fishing at Broad Ripple; was there the evening of the 10th, and all day the 20th, of October, 1869; when I got home, was told of offer to deliver the key; have not had it in my possession; may have seen it; the morning of the 19th of October, 1869, met Bright at the foot of the stairs and told him I could not make the improvements."

Joseph Curzon being duly sworn, testified as follows on behalf of the plaintiff: "McOuat spoke to me, I think, in September, or early in the fall; in October he spoke again, and I told him if he had much brick work to do, it was too late in the season to do it; he spoke of the character of the work; it embraced considerable brick work, three parallel walls sixty feet long, twelve feet high."

On being cross examined, the witness said: "Walls in such cases might be put up; is done in New York and other places; with a large number of hands and an average season could be put up, but does not make a good job; it would take three weeks, with good use of time, and ten or twelve men; if applied to in September, about the 19th, so that I could have made preparations, I would not have hesitated to undertake to do the work after the 19th of October;

think it was between the middle and latter part of October, 1869, he spoke to me; would not then undertake to do a good job; the old building had to be taken down after it was vacated by Bright; I did not know the size McOuat wanted to make it; last season was an unusual one, and mortar froze in October; it would have taken ten days or more to have taken down the old building; I am an architect, and have been nineteen years in this place; when I first spoke to McOuat did not tell him it could not be done; he did not come again until the middle or latter part of October; then told him it was too late in the season."

William A. Lowe being sworn, testified on behalf of the plaintiff as follows: "Conversed with the defendant on the 19th day of October, the day he vacated; he was not consulting me as an attorney; he asked me if I had seen McOuat; told him I understood he was going out to catch some bass at Broad Ripple; Bright said he was going to leave, and asked permission to set two safes in my office, and he did so; can't give his language, but understood there was some misunderstanding; he told me his lease was to be with privilege of continuing longer, and he had continued another six months; Captain Moriarty handed me the lease, and we looked at it together; he said his second six months was out that day, and he was going to give it up, and that McOuat knew that was the day; I told him it had been thirteen months, or seven months of the last term after the expiration of the lease; he said it was immaterial, as McOuat knew that was the day fixed for him to get out of the property; we went into my office and looked at a section of the law; he said he had occupied the premises under the lease for six months, and had continued for another six months."

On cross examination, the witness states that defendant did not say that he had agreed with the plaintiff for another six months, but only that he had just held over.

The defendant, to sustain the issues on his part, then introduced the following testimony:

Abraham Springsteen being duly sworn, testified as follows: "Am a bricklayer, and have been twenty-five years in the business; am a contractor; good work can be done in the winter; I know the McOuat property and the improvements he has made; this could have been done after the 19th of October; the old walls could have been taken down and the brick work done in three weeks; large jobs are sometimes laid up in winter; I finished work for Bright after that time, and then after that put up one hundred and fifty thousand to two hundred thousand bricks; I would as soon do brick work in October or November as any time of the year; the work can be done in winter as well as in July or August."

William C. Moriarty, being first duly sworn, testified as follows: "I am cashier and book-keeper for defendant; I usually paid McOuat's rent; I do not recollect the conversation of September 19th, but do recollect one between plaintiff and defendant on the 19th of July, 1869; after defendant signed a check for the rent, he said to plaintiff that he hoped to be able to surrender possession on the 19th of September, but that he certainly would do so by the 19th of October, at farthest; plaintiff made no objection to this, but replied that he hoped he never would have a worse tenant; the defendant vacated the premises on the 19th day of October; on that day he directed me to take the keys to the plaintiff; I did not know plaintiff's place of business; I took the keys to Andrew McOuat's house, corner of New York and East streets, where plaintiff lived, about nine o'clock, P. M.; I inquired for plaintiff of plaintiff's brother, who raised the window to see what I wanted, and told him that I was instructed to deliver the keys; he answered that the plaintiff was not in the city, and that he was not doing his business, and wished I would settle it with plaintiff; the next morning I left the keys for him at his brother's stove store. All the rent was paid up to the 19th of October, 1869."

Richard J. Bright, the defendant, offered himself as a

witness, and being duly sworn, said: "Mr. McOuat has stated the facts nearly as they occurred; I had been in possession of the property before plaintiff became owner of it, and after his purchase I leased from him for six months, as appears by the lease; about the expiration of that six months, and several times after that, plaintiff wanted me to enter into a new lease; I told him I wanted to buy property of my own, and if I could not do that, then I would make a permanent arrangement with him; I did buy the Wesley Chapel property in April, 1869, and received a deed in May; after my purchase, the question was up several times as to when I would get out of his house; I told him at every interview that I expected to give him possession in September, but would certainly do so by October; he told me he did not think I could be ready to go out before winter; I told him I would certainly be out by October, that I would go out by that time, whether I was ready or not; he said he wanted to make some improvements upon his property, that he could not well make in winter; he did not specify what the improvements were, and did not intimate that October would be too late for him; when he expressed a fear that I would not get out until winter, I told him that if I did not get out by the time I told him I would, I would pay any damages that might accrue to him, if any; in September I was in my office when the rent to that time was paid to plaintiff; I then remarked to him that it was the last payment but one that I would have to make to him; he replied that he hoped he would always have as good a paying tenant; I never told Mr. Lowe, nor any one else, that I had occupied the premises only twelve months; I did not tell him that after the expiration of the first six months, I had taken the premises for another six months, which expired on the 19th of October, the day I vacated; on the 19th of October, 1869, I paid to the plaintiff the rent in full up to that day; on that day, and after the payment, I learned from the plaintiff, for the first time, that he was dissatisfied at my surrendering the premises to him then."

On cross examination, the defendant stated that the conversation about entering into a new lease was before he bought property of his own; that, after that, the plaintiff said nothing to him about executing another lease.

Andrew McOuat, being sworn, testified as follows, as rebutting testimony on behalf of plaintiff: "I had no authority from plaintiff to accept the keys, but I knew of no trouble about the matter, and if Moriarty had come at a proper hour, I would have received them."

George McOuat, the plaintiff, being recalled by his attorney, testified, "that after the defendant had moved out, he consulted Springsteen about making the improvements, who advised him to defer the work until spring. The receipt for the October payment of rent was drawn up in my handwriting, before I called on defendant for the money; it is now present in court, and is as follows:

" 'Received of R. J. Bright, Esq., one hundred and fifty-eight dollars and thirty-three cents, for rent of rooms in Capital House (see lease), up to October 19th, 1869.

" '$158.33.                    GEO. McOUAT.' "

And this was all the testimony given in the cause.

It seems very clear to us that the foregoing evidence fully shows that the parties to this action, on the 19th day of September, 1869, the time when the second term expired, fixed and determined the length of time that the appellant was thereafter to occupy the premises.

McOuat, the appellee, testified as follows:

"In September he paid me one month's rent (on the 19th) and said it would be but one more month. I replied to this that I hoped I would get as good a paying tenant, and on the 19th of October he paid me another month, in full of rent to that day. The time of payment on the 19th of September was the first intimation I had of the time when he would leave; I suggested to him he might go out at a time when I could not make improvements; he said he would pay rent."

Bright, the appellant, testified as follows:

"After my purchase, the question was up several times as to when I would go out of his house; I told him at every interview that I expected to give him possession in September, but would certainly do so by October; he told me he did not think I could be ready to go out before winter; I told him I would certainly be out by October; that I would go out by that time whether I was ready or not; he said he wanted to make some improvements upon his property that he could not well make in winter; he did not specify what the improvements were, and did not intimate that October would be too late for him; when he expressed a fear that I would not go out until winter, I told him that if I did not go out by the time I told him I would, I would pay any damages that might accrue to him, if any; in September I was in my office when the rent to that time was paid to him; I then remarked to him that it was the last payment but one that I would have to make to him; he replied that he hoped he would always have as good a paying tenant."

William C. Moriarty, who was cashier and book-keeper for appellant, testified as follows: "After defendant signed a check for the rent, he said to plaintiff that he hoped to be able to surrender possession on the 19th of September, but that he would certainly do so by the 19th of October, at farthest; plaintiff made no objection to this, but replied that he hoped he would never have a worse tenant."

Mr. Moriarty differs with both appellant and appellee as to the time when such conversation took place, but his recollection of what was said is substantially the same as that of the parties. The appellant and appellee substantially agree upon all the material facts. They both agree that when the rent was paid on the 19th of September, it was understood and agreed between them that the appellant would surrender the possession on the 19th day of October. On that day the appellant paid the rent and surrendered the possession. Such understanding made the tenancy thereaf-

ter for one month, and the appellant, having paid the rent for such month and surrendered the possession in pursuance of such agreement, is not liable for any further rent.

The only material point of difference between the testimony of the parties to the action is, that appellee testified that appellant said that if he did not go out in time for appellee to make improvements, "he would pay rent," while the appellant testified that "he would pay damages." The difference in recollection as to the precise words used cannot affect this case, as the appellee seeks to recover rent, not because he was prevented from making improvements, but on the ground that the appellant, by holding over, became a tenant for six months. Nor does the appellee in this action, seek to recover damages which he may have sustained by being prevented from making such improvements.

We are of the opinion that, under the evidence, the finding should have been for the appellant, and that the court erred in overruling the motion for a new trial, for which error the judgment must be reversed.

The judgment is reversed, with costs; and the cause is remanded, with directions to the court below to grant a new trial, and for further proceedings not inconsistent with this opinion.

*T. A. Hendricks, O. B. Hord, A. W. Hendricks,* and *J. R. Troxell,* for appellant.

*J. E. McDonald, J. M. Butler, E. M. McDonald,* and *W. Wallace,* for appellee.